IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

PUEBLO OF JEMEZ,
JEMEZ MOUNTAINS ELECTRIC
COOPERATIVE, INC.,
TC COMPANY,
TIMOTHY AND INA ACOMB,
BRIAN T. COX,
QUENTIN AND DORIS FARNHAM,
CHRISTIAN GOSSEIN,
CASEY GREENLING,
ANNA MARJEAN HOLLEMAN,
ROBERT S. HOTCHKISS,
MELVIN AND WANONA MAESTAS,
DONALD J. AND KAREN L. MILLER,
JOHN F. AND CHRISTINE M. PETERSON,
THEARON GIFFORD WILLIS,
et al.,

   Plaintiffs,

v.            Case No. 1:25-cv-00382-WJ-KRS


UNITED STATES OF AMERICA,

   Defendant.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

  **THIS MATTER** comes before the Court on the United States' Motion to Dismiss for Lack of Subject-Matter Jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) **(Doc. 12)**.  Plaintiffs the Jemez Pueblo, the Jemez Mountain Electrical Coop, TC Company, and individual property owners bring suit under the Federal Tort Claims Act ("FTCA"), alleging negligence by the United States Forest Service ("the Service") in its execution of a prescribed burn in the Santa Fe National Forest near Jemez Springs, New Mexico in Spring 2022.  The prescribed burn — referred to as the Pino West Prescribed Burn — became the Cerro Pelado Fire in April 2022.  The Cerro Pelado Fire burned

approximately 46,000 acres before it was extinguished on June 15, 2022.

The United States seeks to dismiss the complaint for lack of subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1), alleging that Plaintiffs' claims fall within the discretionary function exception to the United States' waiver of immunity under the FTCA. As set forth below, the Motion shall be granted in part and denied in part.

## I.    Factual Background

From January 19 to February 19, 2022, the Service ignited burn piles in the Santa Fe National Forest in the southern Jemez Mountains in Sandoval County, New Mexico. At the time of ignition, the burn piles were covered in snow. However, as a result of high temperatures, unusually dry conditions, and high winds, snow cover dissipated and by mid-to-late March, disappeared. Plaintiffs allege that the early melting of the snow created the likely scenario that the prescribed burn would escape "prescription" and upon escape, transformation into wildfire was inevitable. **Compl., Doc. 1, at 2**.

On April 18, 2022, an unrelated burn pile associated with the San Juan Mesa Prescribed Burn escaped containment, and the Service dispatched a crew to regain control of that fire. ***Id.* at 4**. Recognizing a risk of other nearby pile burns likewise evading containment, the fire crew checked on the Pino West pile burns. ***Id.*** Discovering smoke rising from "smoldering pile burns," the crew used hand tools to scatter the smoldering embers. ***Id.*** High winds fanned the embers into flames, and, on April 22, 2022, the Cerro Pelado fire began, proceeding to burn 46,000 acres until it was extinguished on June 15, 2022. ***Id.*** As a result of scarring from the fire, watersheds and waterways in the affected region were contaminated. Plaintiffs further allege they "continue to experience loss of structures and forest, and persistent and worsening flooding and erosion" as a result of the damage. ***Id.* at 6**.

In or around March 2023, the Service ordered an internal investigation into the origin and cause of the Cerro Pelado Fire.  On July 24, 2023, the Service publicly reported that the cause of the fire was "a holdover fire from the Pino West Piles Prescribed Fire" and cited "extreme environmental conditions caused by historic draught in 2022."  *Id.* ¶ 20.  The Service also released a copy of the Wildland Report of Investigation ("First ROI"), which was conducted by the Washington State Department of Natural Resources.[1]  **Compl. ¶ 21; Doc. 1-4.**  According to Plaintiffs, the First ROI considered certain misrepresentations by Service personnel, leading the Washington State investigators to "conclude that the origin of the Cerro Pelado Fire could not be determined."  **Compl. ¶ 21.**  Alleged whistleblower complaints within the Service's "District Office" later prompted Service personnel to request a second investigation by the Washington State Department of Natural Resources ("Second ROI").  The Second ROI ultimately attributed the cause of the fire to the escape of the Pino West Prescribed Burn.  *Id.* ¶¶ 22–23; Doc. 1-5.

At the same time that the Pino West Prescribed Burn project was being implemented, two separate prescribed burns started by the Service evolved into wildfires and merged to become the Hermit's Peak/Calf Canyon fire.  *See* Press Release, U.S. Forest Service, Calf Canyon and Hermits Peak fires combine (Apr. 20, 2022), https://www.fs.usda.gov/r03/santafe/newsroom/releases/calf-canyon-fire (last visited May 26, 2026); Press Release, U.S. Forest Service, Firefighters prioritize suppression repair on private lands (July 13, 2022), https://www.fs.usda.gov/r03/santafe/newsroom/releases/firefighters-prioritize-suppression-repair-private-lands-july-13-2022 (last visited May 26, 2026).  That fire — the most destructive in New Mexico history — devastated hundreds of thousands of acres of land in San Miguel, Mora and Taos Counties in the southern Sangre de Cristo Mountains.  *See* KOAT

---

[1] The Court assumes the Washington State Department of Natural Resources was brought in as an independent, outside agency to conduct the investigation as to the origin of the Cerro Pelado Fire.

News, Calf Canyon/Hermits Peak Fire becomes largest wildfire in state history (June 10, 2022), https://www.koat.com/article/calf-canyon-hermits-peak-fire-largest-new-mexico-fire/40009864 (last visited May 26, 2026).  The Service admitted responsibility for those fires, and Congress passed the Hermit's Peak/Calf Canyon Fire Assistance Act, Pub. L. No. 117-180, §§101 et seq., 136 Stat. 2114, 2168 (2022), establishing a statutory mechanism for victims of the fires to seek compensation from the United States Government for their losses.

It bears mentioning that in 2000, in what would become known as the Cerro Grande fire, a controlled burn initiated by the National Park Service at Bandelier National Monument spiraled out of control, devastating a huge area in and around Los Alamos County, including many homes in Los Alamos, significant portions of national forest and private lands and portions of the land comprising the Los Alamos National Laboratory.  At that time, Congress enacted the Cerro Grande Fire Assistance Act, Pub. L. No. 106-246, 114 Stat. 511, 584 (2000), establishing a process to consider and settle claims for injuries caused by the fire.  No comparable legislation has been enacted to compensate the victims of the Cerro Pelado fire.

Fast forward to 2016, when, in the aftermath of controlled burns that escalated and escaped prescribed boundaries in the upper Midwest region of the country, Congress enacted the Prescribed Burn Approval Act, Pub. L. No. 114-275, 130 Stat. 1405 (2016) ("the Act"), *codified at* 16 U.S.C. § 551c-1.  As the content of the Act reflects, this legislation was introduced to promote accountability of the Service and ensure cooperation with the relevant state government and local fire officials — those most familiar with the land and best positioned to assist, if needed.  *See* 16 U.S.C. § 551c-1(b); 162 Cong. Rec. H7159–60 (daily ed. Dec. 5, 2016).  The legislative history reflects support from members of Congress whose states had experienced damage to private and public lands as a result of the Service's management, or mismanagement,

of prescribed burns.  One member described a controlled burn in the Dakota Prairie Grasslands "intended for 130 acres" that, "[a]s weather conditions changed," "escaped its boundary and burned 16,000 acres of private land."  162 Cong. Rec. at H7159.  Another representative described a recent fire "intended to cover just 130 acres of dead crested wheatgrass."  *Id.* at H7160.  "Despite . . . hot and windy conditions and being warned repeatedly from local ranchers and local officials that it was too windy and too dry," the Service proceeded to light the dry grass, only for the burn to "escalate[] out of control" damaging 10,000 acres of public and private land.  *Id.*

While the allegations here — ten years later — do not concern the conditions under which the Pino West Prescribed Burn was ignited, this case nonetheless evokes a sense of déjà vu.  The alleged damage and destruction again flow from a prescribed burn started by an agency of the federal government that escaped containment under dry and windy conditions.  And just as the fires discussed above were attributed to prescribed burns conducted under hazardous conditions, Plaintiffs here allege that the prescribed burn should not have been permitted to "continue" under similar circumstances.  As explained below, the Court is not persuaded that the Act bears on the "continuation" of a prescribed burn or otherwise negates the Service's discretion once a burn escapes prescribed boundaries.  The Court notes only that this is not the first and likely will not be the last tort case arising from the Service's execution of a prescribed burn under suboptimal conditions.

## II.    Legal Background

The United States is generally immune from suit under the doctrine of sovereign immunity. The Federal Tort Claims Act provides a limited waiver of this immunity for certain claims against the federal government.  *United States Postal Serv. v. Konan*, 607 U.S.----, 146 S. Ct. 736, 740

(2026).  The FTCA allows individuals to sue the United States "for injuries or loss of property 'caused by the negligent or wrongful act or omission of' a federal employee 'acting within the scope of his office or employment.'"  *Id.*, 607 U.S.----, 146 S. Ct. at 740 (quoting 28 U.S.C. § 1346(b)(1)).  The FTCA, however, restores immunity for certain categories of claims.  As relevant here, 28 U.S.C. § 2680 precludes suit "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty."  This exception is commonly known as the FTCA's discretionary function exception.  *See, e.g.*, *United States v. Gaubert*, 499 U.S. 315, 322 (1991).

### A.  The Discretionary Function Exception

The Supreme Court has developed a two-part test that courts must apply in determining whether challenged conduct falls within the discretionary function exception to the FTCA's waiver of sovereign immunity.  First, the Court determines whether the act or omission was "a matter of choice for the acting employee."  *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 536 (1988).  The exception does not apply "when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow."  *Id.*  If, on the other hand, the action involves "an element of judgment" under element one, the exception "typically applies."  *Knezovich v. United States*, 82 F.4th 931, 937 (10th Cir. 2023).

"[E]ven if the challenged conduct was discretionary, jurisdiction can still be established at step two."  *Id.*  At this step, the Court "determine[s] whether th[e] judgment is the kind that the discretionary function exception was designed to shield."  *Berkovitz*, 486 U.S. at 536.  This inquiry is intended to preserve the purpose of the exception — to protect federal employees' "exercise of judgment based on considerations of public policy."  *Garcia v. U.S. Air Force*, 533 F.3d 1170, 1176 (10th Cir. 2008); *see also Berkovitz*, 486 U.S. at 536–37 ("The basis for the discretionary function

exception was Congress' desire to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.") (quotation marks and citation omitted).  "If both elements are met, the governmental conduct is protected as a discretionary function, and sovereign immunity bars a claim that involves such conduct." *Garling v. U.S. Env't'l Protection Agency*, 849 F.3d 1289, 1295 (10th Cir. 2017) (citing *Berkovitz*, 486 U.S. at 536).

As the parties asserting jurisdiction, Plaintiffs have the burden to show that the discretionary function exception does not apply.  *Hardscrabble Ranch, L.L.C. v. United States*, 840 F.3d 1216, 1220 (10th Cir. 2016); *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002).  "For a complaint to survive a motion to dismiss" for lack of subject matter jurisdiction based on the discretionary function exception, "it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." *Gaubert*, 499 U.S. at 324–25.  Even when the challenged conduct arises from the same incident, unless the conduct is so intertwined it may not be distinguished analytically, the Court examines the sufficiency of the pleadings with respect to each challenged action.  *See Johnson v. United States, Dep't of Interior*, 949 F.2d 332, 336 (10th Cir. 1991) (examining "separately Plaintiff's claims regarding (1) regulating climbing activity, and (2) initiating and conducting rescue efforts.").

**B.  Rule 12(b)(1) Standard**

Where, as here, the movant lodges a facial challenge to jurisdiction under Fed. R. Civ. P. 12(b)(1), the court assumes the well-pled allegations in the complaint are true.  In contrast to the more searching review conducted on a factual jurisdictional challenge, the scope of a facial challenge is generally limited to the four corners of the complaint.  *Pueblo of Jemez v. United*

*States*, 790 F.3d 1143, 1148 n.4 (10th Cir. 2015); *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994).  The Court may, however, consider documents outside the complaint if they are central to the plaintiffs' claims and incorporated by reference therein.  *See GFF Corp. v. Associated. Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).  Because the Court determines the well-pled allegations in the Complaint are sufficient to establish the Court's jurisdiction, discovery of jurisdictional facts is not required.

### III.    The Execution of the Pino West Prescribed Burn

Plaintiffs do not contend that the Service lacked discretion to initiate the Pino West Prescribed Burn.  **Doc. 18 at 12**.[2]  Their claims concern instead the execution of the prescribed burn.  The course and scope of that execution, they contend, is governed by the Act, the Service's regulations, the Forest Service Manual ("the Manual"), the Forest Service Handbook ("the Handbook"), the National Wildfire Coordinating Group's Interagency Prescribed Fire Planning and Implementation Procedures Guide, PMS 484 ("Interagency Guide"), and the Pino West Prescribed Burn Plan (the "Burn Plan") (**Compl. Ex. 1**, **Doc. 1-2**).  Plaintiffs allege the Burn Plan specifically governed the implementation of the Pino West Prescribed Burn and compliance with the Burn Plan's directives was not optional.  **Compl. ¶ 13; Doc. 18 at 12.**

#### A. Whether the Disappearance of Snow Cover Eliminated the Service's Discretion to "Continue" the Prescribed Burn

Plaintiffs allege that snow cover must persist throughout the duration of a prescribed burn for the burn to be "within prescription."  **Doc. 18 at 7 n. 5**.  Once snow cover dissipates, they allege, the prescribed burn escapes prescription and thus is no longer authorized by statute or the Burn Plan.  Plaintiffs assert that mandatory language in the Act, when considered in conjunction with other policies governing the Service's firefighting activities, such as the Handbook, the Manual,

---

[2] Page numbers reflect the pagination assigned by CM/ECF.

and the Interagency Guide, eliminates the Service's discretion once a prescribed burn evades prescription. *Id.* at 9. Plaintiffs also argue that a limit on the Service's authority to "continue" a prescribed burn once snow cover dissipates is supported by the Burn Plan's numerous references to the condition of continuous snow cover, including within a section titled "Prescription Parameters." *Id.* at 9, 25, 28; *see* Doc. 1-2 at 17.

As its name suggests, the Act imposes limitations on the Service's authority to approve prescribed burns. Under the Act, the Service may not authorize a prescribed burn in an area subject to a rating of "extreme fire danger level" under the National Fire Danger Rating System. 16 U.S.C. § 551c–1. Although the Act concerns the conditions in which a prescribed burn may be "approved," as described above, Plaintiffs contend that the Act, as integrated with the Manual, the Handbook, and the Interagency Guide, establishes a mandatory framework that extends beyond approval and eliminates any discretion once a prescribed burn is outside prescription or conditions become "extreme." Doc. 18 at 9, 12–13, 22.

The Court is not persuaded that the Act carries the force Plaintiffs attribute to it. In relevant part, the Act states, "the Secretary shall not authorize a prescribed burn on Forest Service land if, for the county or contiguous county in which the land is located, the national fire danger rating system indicates an extreme fire danger level." 16 U.S.C. § 551c-1(a). Plaintiffs place significance on the word "shall." Doc. 18 at 9. Although it is true that "shall" denotes obligation, the scope of that obligation is defined by the text that follows. The remainder of the provision speaks to the authorization of a prescribed burn — not to actions taken after approval. While the Act forbids the Secretary from authorizing a prescribed burn under certain environmental conditions, it does not "specifically prescribe[] a course of action for an employee to follow" upon that approval. *Berkovitz*, 486 U.S. at 536. Nor does it support a categorical constraint on the

9

Service's response to a prescribed burn that has evaded prescription.

Plaintiffs advance two additional arguments premised on the Act's allegedly mandatory nature. First, Plaintiffs contend that the Manual, the Handbook, and the Interagency Guide implement the Act, such that the guidance contained in those documents is mandatory. **Doc. 18 at 8.** As explained, however, the Act's mandatory provisions govern only the conditions under which a prescribed burn may be approved. Plaintiffs do not contend that the prescribed burn was negligently approved or ignited. Second, Plaintiffs argue that the Manual and the Handbook "operationalize" the Act by requiring compliance with prescribed burn plans. *Id.* Consistent with that view, they assert that the Burn Plan conditioned the Service's authority to continue the Pino West Prescribed Burn on continuous snow cover. As the Court has concluded, though, the Act's directives concern approval and are temporally limited to the initiation of the prescribed burn — not its subsequent execution.

Plaintiffs contend that the Burn Plan's references to required snow cover eliminate discretion once snow cover dissipates, regardless at what stage environmental conditions evolve. *E.g.*, **Compl. ¶ 36(d), (e).** This theory cannot be squared with *Berkovitz*, which requires mandatory conduct. 468 U.S. at 536. The cited provisions of the Burn Plan speak to the environmental conditions under which a prescribed burn may occur; they do not prescribe a mandatory course of action once those conditions are present. *See, e.g.*, **Doc. 1-2 at 17** (describing the "environmental prescription parameter[]" of "[c]ontinuous snow coverage of the forest floor over the entire burn unit"). In other words, the references to continuous snow cover describe when a prescribed burn may proceed — not how officials must act in carrying it out.

In light of the foregoing, the Court need not decide whether the Act incorporates the agency documents Plaintiffs cite. It suffices that Plaintiffs' theories premised on the Act's mandatory

10

nature do not establish binding post-ignition obligations.  The Court therefore turns to Plaintiffs' remaining allegations, which identify specific provisions governing monitoring and contingency planning.  Before doing so, the Court addresses the Tenth Circuit's wildfire cases on which the United States relies to argue that the challenged conduct falls within the discretionary function exception.  Those cases recognize the federal government's substantial discretion in wildfire management decisions.  They do not, however, establish that all conduct in this context is categorically discretionary.  Accordingly, the Court declines to adopt the United States' broader reading and proceeds to consider whether Plaintiffs have identified specific, mandatory directives governing the conduct at issue.

### A.  The Tenth Circuit's Wildfire Precedent

The Tenth Circuit has emphasized that the Service's response to wildfires involves the weighing of public policy concerns and that the discretionary function exception generally precludes liability for such conduct.  *Hardscrabble Ranch*, 840 F.3d at 1222; *Knezovich*, 82 F.4th at 938; *Strawberry Water Users Ass'n v. United States*, 109 F.4th 1287, 1293–94 (10th Cir. 2024).  The United States argues that those decisions likewise bar claims arising from the agency's management of a prescribed burn.  **Doc. 12 at 14–20**.  But this case arises in a different posture.  Plaintiffs allege not only that the Service exercised poor judgment in responding to an uncontrolled wildfire, but also that the Service violated specific, mandatory policies governing prescribed ignition, monitoring, and contingency planning.

*Hardscrabble Ranch* followed a development in the Service's approach to fire management that permitted the Service to deploy naturally ignited fires for its fire management objectives by suppressing fires only in part, allowing some blazes to proceed.  In that case, the Service elected to partially — rather than fully — suppress a lightening-ignited fire in a remote section of the Wet

Mountains of Colorado.  840 F.3d at 1217–18.  A snowstorm was expected to arrive the day the decision was made, and high winds in advance of that storm caused the fire to evade containment before the Service implemented a strategy to extinguish the fire in full.  The owner of affected private ranchland sued under the FTCA, and the Tenth Circuit ruled that the discretionary function applied.  The ranch owner relied on a checklist of questions agency personnel allegedly needed to consider before determining whether to allow a naturally ignited fire to persist in a controlled manner. *Id.* at 1219.  Because the considerations outlined in the checklist and their "weighing" were "inherently discretionary" the Court concluded that that checklist "did not remove USFS employees' choice or judgment regarding what measures to take." *Id.* at 1221.  The Tenth Circuit thus concluded that the checklist did not eliminate discretion but instead informed a policy-laden judgment about how to manage the fire.

*Knezovich* similarly addressed a challenge to the Service's decision to delay a full suppression response.  Although the origin of the fire was undetermined, the *Knezovich* Plaintiffs argued that measures applicable to human-caused fires should be taken, and that the Service has no discretion to use human-caused fires for resource benefits.  Plaintiffs relied upon a provision in the Manual prohibiting the consideration of forest management objectives and permitting applicable only to firefighter and public safety concerns in the event of "[h]uman-caused fires and trespass." *Knezovich*, 82 F.4th at 938 n.1.  The Court rejected the plaintiffs' argument because the cited provision did not "specify the precise manner in which the Forest Service must respond to a human-caused fire" and appeared in the context of other "competing considerations that bear on a wildfire response." *Id.* at 939–40 (quotations removed).  The Court concluded that the essence of the plaintiffs' claims was the Service's response to the fire, that such action was "quintessentially discretionary" and that the cited provision did not "specify the precise manner in which the Forest

12

Service must respond to a human-caused fire." *Id.* at 938–39 (quotations omitted).  The Court noted that the provision appeared in the context of other "competing considerations that bear on a wildfire response." *Id.* at 938–40.  The court likewise held that the cited provision did not impose a specific, mandatory course of action, and that the challenged response remained discretionary.

On their surface, *Kzenovich* and *Hardscrabble Ranch* may be read to establish that mandatory language does not negate the Service's discretion in responding to a fire.  But reading the opinions to confer blanket immunity for all fire-management activity overstates the reach of these two Tenth Circuit cases.  First, both cases involved the Service's response to naturally ignited or third-party-caused fires — not the management of a fire the Government itself deliberately set.  The Tenth Circuit has not addressed the discretionary function exception in the distinct context of a prescribed burn.  Second, the provisions at issue in those cases did not prescribe a specific course of conduct but instead set forth general conditions or procedures, leaving their implementation to agency judgment.  By contrast, Plaintiffs in this case point to provisions in the Burn Plan that mandate specific actions during the execution of the prescribed burn.  Those provisions bear directly on the first *Berkovitz* question, as opposed to policy considerations underlying discretionary decision-making.  In contrast to *Hardscrabble Ranch* and *Knezovich*, Plaintiffs here effectively submit language that "specifically prescribes a course of action for an employee to follow." *Berkovitz*, 486 U.S. at 536.

Third, *Berkovitz* requires that the Court begin by addressing whether Plaintiffs have alleged the violation of such a directive.  486 U.S. at 536.  Only if no such directive exists does the analysis proceed to whether the challenged conduct is susceptible to policy-based judgment.  By collapsing these steps, the United States effectively answers the second question without first addressing the threshold inquiry *Berkovitz* requires.  *Knezovich* and *Hardscrabble Ranch* do not foreclose FTCA

liability, even for negligent suppression if policy language prescribing specific, mandatory action is sufficiently alleged.

The Service's activities in igniting, monitoring, and controlling a prescribed burn are governed by the Burn Plan. An analogous policy document was not at issue in either *Knezovich* or *Hardscrabble Ranch*, which, again, did not involve prescribed burns the Government deliberately set. Construing the factual allegations in the light most favorable to Plaintiffs, the Court assumes the Burn Plan governs the execution of the Pino West Prescribed Burn. The Court therefore turns to whether Plaintiffs have plausibly alleged the violation of specific, mandatory directives contained in the Burn Plan.

**B. Mandatory Directives Concerning Minimum Monitoring and Contingency Resources**

Plaintiffs advance several theories of negligence, some of which plausibly allege conduct constrained by mandatory directives, and others which do not. The Court addresses these categories in turn.

**i. Minimum Monitoring of Weather and Burn Pile Consumption**

Plaintiffs allege that the Service was required to monitor the weather and consumption of burn piles after ignition to ensure snow cover would persist until extinguishment. **Compl. ¶ 24(a); Doc. 1-2 at 19–20.** The Burn Plan provides that "the Burn Boss will monitor weather conditions for days following the day of ignitions," **Compl. ¶ 15(a); Doc. 1-2 at 19**, and "[v]isual monitoring will be used to assess fire behavior of the piles" and "to ensure desired consumption of slash piles." **Compl. ¶ 15(e); Doc. 1-2 at 30**. The Burn Plan also specifies that "[p]ost-[b]urn [a]ctivities that must be [c]ompleted" include "[a]dequate patrol, by fire red-carded personnel" and "[r]e-visit[ing] the pile burned units to establish if desired consumptions were met and project objectives achieved." ***Id.***

14

Although the Burn Plan does not define what constitutes an "adequate" patrol, it plainly requires agency personnel to exercise at least some oversight over the status of the burn piles and the weather conditions for some period after ignition.  These requirements are bolstered by guidance in the Manual, which the Court assumes applies at the pleading stage.  The Manual specifies that "[w]eather conditions must be monitored during all phases (including mop up) of prescribed fire implementation," "[a] project-specific spot weather forecast must be obtained . . . for each day that ignition continues; on any day the fire is actively spreading; or when conditions adversely affecting the prescribed fire are predicted in the general forecast" and "[l]ong-term weather conditions such as drought must be considered in all phases of prescribed fire planning and implementation."  Forest Service Manual 5100, ch. 5140, 5142.3(b) (Apr. 2, 2020); *see also* **Doc. 18-2 (Interagency Guide) at 19**.  The words "must" and "will" denote obligations that attach once the agency elects to ignite the burn piles.

The United States contends that the cited policies leave room for discretion in how monitoring is conducted, including its frequency.  **Doc. 12 at 23**.  That may be so.  But the relevant provisions do not merely guide how monitoring should occur — they **require** that some monitoring occur.  The United States also suggests that any monitoring obligation is satisfied so long as personnel respond once a risk is apparent.  ***See*** **Doc. 12 at 23** ("[T]he Forest Service *did* return to patrol the burn piles—at least on April 20.").  The cited policies do not support so narrow a view.  They contemplate ongoing monitoring during the prescribed burn, not merely a reactive response after conditions have deteriorated.  The policies do not permit discretion to forgo monitoring until an emergent risk is brought to the Service's attention.

Plaintiffs sufficiently allege that the Service conducted no monitoring at all.  **Compl. ¶ 24(c)**.  As explained above, the failure to undertake any monitoring is inconsistent with

applicable directives mandating that, at minimum, some monitoring occur.  Because these allegations satisfy Plaintiff's burden under *Berkovitz* step one, the Court does not proceed to step two.

### ii.  Contingency Resources

Plaintiffs allege that the Service was required to ensure certain "contingency resources" were available to be deployed within a certain period of time in the event the prescribed burn escaped control.  **Compl. ¶ 15(c)**.

The Burn Plan states: "If prescription parameters are exceeded or anticipated to be exceeded, the following contingency resources will be used to help keep the fire in-check until it is back in prescription.  This must be accomplished within the next burning period (FSM 5140.31) in order to avoid conversion to 'wildfire.'"  **Doc. 1-2 at 26**.  "**The minimum contingency resources needed to implement [the prescribed burn] is 1 Type 6 Engines or 3 red carded personnel**."[3] *Id.* **at 26–27** (bolding in Burn Plan).  "Once a contingency resource is committed to a specific wildland fire action (wildfire or prescribed fire)," the Burn Plan specifies, "it can no longer be considered a contingency resource for another prescribed fire project, and a suitable replacement contingency resource must be identified or the ignition halted." *Id.* **at 27**.  Once a wildfire is declared, the Burn Plan directs that "[c]ontingency resources will be ordered through Santa Fe Dispatch." *Id.* **at 27–28**.

The United States characterizes Plaintiffs' challenge as concerning agency personnel's reaction to the discovery of smoldering embers — specifically, their decision to extinguish smoldering embers by scattering them.  **Doc. 12 at 23–24**.  But the Court does not read the Complaint to

---

[3] Plaintiffs define a type 6 engine as a "smaller, wildland fire engine with a water tank designed for initial attack and maneuverability in rough terrain." **Compl. at 15 n.14**.  "Red-carded personnel" are similarly defined as "individuals who have completed the necessary training and qualifications to participate in wildland fire operations, including prescribed burns." *Id.* **at 11 n. 10.**

challenge the choice of one suppression strategy over another, as such a criticism would surely fall within the discretionary function exception. The Complaint simply alleges that mandatory contingency resources were not implemented as required under the Burn Plan. **Compl. ¶ 17**.

While the Burn Plan may permit discretion in how contingency resources are deployed, it does not render their availability optional. The Burn Plan establishes a minimum set of contingency resources — "1 Type 6 Engine" or "3 red carded personnel" — required to be on reserve for the Pino West Prescribed Burn. **Doc. 1-2 at 27**. Further, it provides that such resources "will be used" if prescription parameters are exceeded or anticipated to be exceeded. ***Id.* at 26**. At this stage, Plaintiffs plausibly allege that these minimum requirements were not satisfied. **Doc. 18 at 30; Compl. ¶ 24**. Those allegations, taken as true, describe a failure to comply with a mandatory directive, and therefore fall outside the discretionary function exception.

### iii.    Response Once a Fire Evades Prescribed Boundaries

Having found that ensuring the availability and deployment of minimum resources is nondiscretionary under the Burn Plan, the Court moves to Plaintiffs' allegations regarding the response to a prescribed burn's escape from containment and the declaration of wildfire. Because the policy provisions alleged involve discretionary considerations by the Service, these allegations fall within the discretionary function exception.

Plaintiffs allege that the "Burn Boss" was required to declare wildfire when the Pino West Prescribed Burn escaped containment. **Compl. ¶ 15(d)**. But review of the applicable provision of the Burn Plan reveals that it sets forth a set of considerations to guide the Burn Boss in his or her decision to declare a wildfire, rather than prescribes a specified course of action. Specifically, the Burn Plan states:

> The designated Burn Boss can make the recommendation of wildfire
> conversion to the agency when he/she determines that one or more

17

of the following conditions or events have occurred, or is likely to occur, and cannot be mitigated within the next burning period by utilizing the mitigation/holding or contingency actions identified in the burn plan:

1. The prescribed fire leaves the approved burn project boundaries.
2. The fire behavior exceeds limits described in the prescribed fire plan.
3. The fire effects are unacceptable.

**Doc. 1-2 at 27–28.**

Notably, the Burn Plan does not state that the Burn Boss *shall* recommend wildfire conversion upon the occurrence of one of the specified events. The word "can" commonly means "able to" and is interchangeable with "may." Can, Merriam-Webster, https://www.merriam-webster.com/dictionary/can (last visited May 26, 2026). Under either understanding, the provision connotes discretion or authority, not obligation. *See Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103 (2016) ("The word 'may' clearly connotes discretion[.]"); *see also* **Doc. 18-2 (Interagency Guide)** ("Use of the term[] . . . 'can' . . . convey[s] optional compliance."). The provision therefore does not prescribe a specific course of action the Burn Boss is required to follow. Plaintiffs' allegations regarding the failure to declare wildfire thus fail to satisfy step one of *Berkovitz*.

The declaration of wildfire by the Burn Boss implicates the sort of discretionary decisionmaking the exception is designed to protect. What may appear to an outside observer to be an unacceptable consequence of a prescribed burn may nevertheless reflect the considered judgment of the agency charged with managing national forests. The Service is best positioned to determine whether "fire behavior" has exceeded designated limits. Once such a declaration is made, Service personnel and resources may need to be redirected from other ongoing operations or emergencies. Decisions regarding the allocation of scarce firefighting resources — particularly in times of high demand — are "quintessentially discretionary" policy judgments. *Knezovich*, 82

18

F.4th at 938.

### iv. Holding Plan

Plaintiffs allege the Burn Plan's element, "Holding Plan"—an "outline[]" of "the resources and actions needed to keep the fire contained within the designated burn area" — mandates certain action from the Burn Boss. **Compl. at 9 n. 7, ¶ 15(b)**. A subparagraph within this section of the Plan states that "[g]eneral [p]rocedures for [h]olding" include "[u]pon completion of the operational period the Burn Boss will specify the requirements to vacate the area and determine patrol status and frequency." **Doc. 1-2 at 25**; **Compl. ¶ 15(b)**. To be sure, the word "will" connotes obligation. But as explained above, the scope of that obligation is characterized by the phrase that follows. The provision as a whole instructs that the Burn Boss specify holding requirements and determine patrol status and frequency. These decisions are inherently discretionary. *See Hardscrabble Ranch*, 840 F.3d at 1222 ("The existence of some mandatory language does not eliminate discretion when the broader goals sought to be achieved necessarily involve an element of discretion.") (quoting *Miller v. United States*, 163 F.3d 591, 595 (9th Cir. 1998)). The broader goal to be achieved by "holding" — as Plaintiffs allege — is keeping the fire in check. **Compl. at 9 n. 7**. The allocation of resources sufficient to maintain control of a prescribed burn and the employment of strategies considering competing priorities necessarily involve discretionary determinations. Indeed, some of the factors bearing on this determination are outlined in this section. ***See, e.g.***, **Doc. 1-2 at 26** ("Project areas near structures, private land and roadways may require additional monitoring as deemed necessary by the burn boss.").

The balancing of competing agency priorities along with factors such as risk to neighboring property and human safety, is "precisely the kind of social, economic, and political" evaluation the exception was "designed to shield from 'judicial second guessing.'" *Hardscrabble Ranch*, 840

19

F.3d at 1223 (quoting *Berkovitz*, 486 U.S. at 536–37).  Therefore, Plaintiffs' claims based on the

Holding Plan element of the Burn Plan are precluded under *Berkovitz*.

## CONCLUSION

As explained herein, the Court properly exercises jurisdiction over some of Plaintiffs' claims.

The Motion is therefore DENIED to the extent it seeks to dismiss the claims regarding monitoring

and contingency resources.  The Motion is GRANTED as to those claims falling within the

discretionary function exception, as described above.

The United States' motion to dismiss for lack of subject matter jurisdiction is therefore

GRANTED and DENIED in part.

**SO ORDERED.**


/s/_____
WILLIAM P. JOHNSON
SENIOR UNITED STATES DISTRICT JUDGE

20